**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| VISION AUGMENTATION TECHNOLOGY LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>SICK AG, SICK, INC., AND SICK PRODUCT & COMPETENCE CENTER AMERICAS, LLC,<br><br>*Defendants.* | Civil Action No. 4:25-cv-05231<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Vision Augmentation Technology LLC ("VAT" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent No. 7,433,021 (the "'021 patent" or the "patent-in-suit"). Defendants SICK AG, SICK, Inc., and SICK Product & Competence Center Americas, LLC (collectively, "SICK" or "Defendants") infringe the patent-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

## THE PARTIES

1.      VAT is a Texas limited liability company having its principal place of business at 121 Frederick St., Austin, TX 78704.

2.      Upon information and belief, SICK AG is a corporation organized and existing under the laws of Germany with its principal place of business at Erwin-Sick-Str. 1, 79183 Waldkirch, Germany.

3.      Upon information and belief, SICK, Inc. is a corporation organized and existing under the laws of Minnesota with its principal place of business at 6900 West 110th Street, Bloomington, MN 55438.

1

4.      Upon information and belief, SICK Product & Competence Center Americas, LLC is a limited liability company organized and existing under the laws of Minnesota with its principal place of business at 6900 West 110th Street, Bloomington, MN 55438.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

5.      This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has specific personal jurisdiction over SICK pursuant to due process and/or the Texas Long Arm Statute. SICK has sufficient minimum contacts with the forum because, inter alia, (i) SICK has conducted business in Texas, including in this District, and (ii) SICK has, directly and through intermediaries, committed acts of patent infringement in Texas including in this District, through at least October 10, 2025. Moreover, SICK actively directs its activities to customers located in the State of Texas and this District.

7.      For example, upon information and belief, SICK AG's subsidiaries SICK, Inc. and SICK Product & Competence Center Americas, LLC – acting at the direction of SICK AG, sell, within this District, the State of Texas, and elsewhere in the United States, products accused of infringement in this case. SICK AG works in conjunction and through its foreign and domestic subsidiaries to obtain products and distribute them throughout the United States, including Texas.[1]

8.      In addition, upon information and belief, SICK AG's U.S. subsidiaries, SICK, Inc. and SICK Product & Competence Center Americas, LLC, maintain an office in this District at 5500 North Sam Houston Pkwy West, Suite 100, Houston, TX 77086.[2]

---

[1] See, e.g., https://goies.com/index.php/product-manufacturers/supplier-index/sick?
[2] See, e.g., https://www.epa.gov/system/files/documents/2024-07/amp-sick-ultra-flow-meter-response-ltr-2024-07-02.pdf; https://cn.panjiva.com/Sick-Pca/62568345; https://www.sick.com/medias/ISO-9001-2015-all-sites-rev1.pdf?context=bWFzdGVyfGNvbnRlbnR8OTAzNDV8YXBwbGljYXRpb24vcGRmfGNvbnRlbnQvaDE5L2gyYi85NjgwNDU5OTIzNDg2LnBkZnwxZmQ1ODQ1NTUyNzRkMzgxMzk4NDVmNTRmMjM5ZDI5OGE2MTVmYzNkMjY5MWIyMTU0NGZkN2E0ZDVjYTMyNzEx mYzNkMjY5MWIyMTU0NGZkN2E0ZDVjYTMyNzEx&

2

9.      This has given rise to this action and has established more than sufficient

minimum contacts with this District, such that the exercise of jurisdiction over SICK in this

Court would not offend traditional notions of fair play and substantial justice.

10.     Venue is proper in this District as to SICK AG under 28 U.S.C. § 1391(c)(3)

because SICK AG is a foreign corporation and may be sued in any judicial district. In addition,

upon information and belief, SICK AG, directly or through its U.S. affiliates and agents, causes

the accused Visionary-S products to be imported into, offered for sale in, and/or sold within the

Southern District of Texas.

11.     Venue is proper in this District as to SICK, Inc. and SICK Product & Competence

Center Americas, LLC under 28 U.S.C. § 1400(b) because both entities have a regular and

established place of business in this District and have committed acts of infringement in this

District, inter alia, importing, offering to sell, selling, and/or using the accused products.

## THE INVENTOR

12.     Joseph C. Saltsman ("Saltsman") is the inventor of the '021 patent.

13.     Saltsman earned his Bachelor of Science in Electrical Engineering from Norwich

University in Northfield, Vermont, in 1986. As the oldest private military college in the United

States, Norwich is renowned for its rigorous programs that forge leaders in engineering and

technology. Saltsman's education there—grounded in a disciplined, hands-on curriculum

emphasizing problem-solving, precision design, and applied sciences—provided the scholarly

foundation for his pioneering work in sensor systems, controls engineering, and energy

technologies.

14.     Over a three-decade career, Saltsman has held key engineering roles at General

Electric ("GE") and its Hitachi division, focusing on nuclear energy, steam turbine controls, and

advanced systems.

15.     Starting as a Quality Assurance Engineer at Xyvision, Inc. in 1986, Saltsman

advanced to Capacitance Probe Engineer at ADE in 1989, where he contributed to non-contact

measurement technologies. By 1994, he was streamlining manufacturing processes at Boston

Technology. Wanting to give back to the community, Saltsman then decided to transition to education, teaching high school math and sciences at United Christian Academy from 1995 to 1999, before serving as Network Administrator at North Country Union High School until 2001.

16.     In 2001, Saltsman joined GE as a Non-Nuclear Steam Turbine Controls Engineer where he configured hardware and software for innovative new steam turbine designs. Then, beginning in 2003, his professional focus transitioned to nuclear engineering, where he adapted his steam turbine knowledge to nuclear projects. From 2006 to 2012, Saltsman served as Lead Training Instructor for nuclear steam turbine and generator excitation controls, delivering classes worldwide to GE employees and customers on troubleshooting, operation, and valve calibration using simulated environments.

17.     Returning to project engineering at GE from 2012 to 2017, Saltsman led upgrades of large-scale nuclear steam turbine controls, coordinating mechanical, software, and cybersecurity teams to replace analog systems with digital Triple Modular Redundant (TMR) computers. He managed Factory Acceptance Tests with full hardware simulators and delivered NRC-required documentation like Software Requirements Specifications and Requirements Traceability Matrices.

18.     From 2017 to 2020, Saltsman advanced through roles at the FitzPatrick Nuclear Power Plant, including System Engineer for main generator and turbine controls, Emergent Rapid Response for electrical issues, and managing the Feed Water Level Control digital upgrade as part of the Central Design Organization. He rejoined GE in 2020 as a Controls Engineer, configuring Mark VIe systems for combined cycle plants and providing site support.

19.     Finally, since 2022, Saltsman has been employed at GE Hitachi – GE's nuclear division. There, he has engineered nuclear reactor rod controls using Rexroth Indra Drives and configured digital controls for steam turbine integration into the GE BWRX-300 Small Modular Reactor (SMR) power plant.

20.     In addition to a number of foreign patents, Saltsman is the sole inventor of five United States patents and one pending patent application. His inventions span airborne target

4

acquisition, musical systems, nuclear steam turbine valve testing algorithms, and a pending green-energy point-absorber system for generating power from the waves of the ocean.

## TECHNOLOGY BACKGROUND

21.     Targeting and navigation technologies trace their roots to ancient triangulation methods used in surveying and astronomy, where early civilizations like the Greeks employed geometric principles to measure distances and positions. However, the modern era began with foundational experiments on electromagnetic radiation by German physicist Heinrich Hertz in the late 1880s, which laid the groundwork for radar. Radar's practical development accelerated during World War II, with systems like the British Chain Home network in 1939 providing early warning of airborne threats through radio-wave reflection.

22.     By the 1960s, the invention of charge-coupled devices (CCDs) by Willard Boyle and George E. Smith at Bell Labs in 1969 revolutionized optical tracking, allowing digital capture of light for precise measurements. Concurrently, infrared sensors emerged for nighttime and heat-seeking applications, enhancing detection of missiles and vehicles in low-visibility conditions.

23.     The 1970s introduced satellite-based triangulation with the conceptualization of the Global Positioning System (GPS) by the U.S. Department of Defense, becoming fully operational by 1995. Early military demonstrations in the 1990s showed GPS's feasibility for tracking projectiles in flight, integrating real-time satellite signals with ground-based sensors for high-accuracy navigation and targeting.

24.     The 1980s and 1990s witnessed the rise of stereoscopic systems, employing multiple sensors for 3D localization. Examples include early laser rangefinders and radio frequency (RF) triangulation in air defense networks, as explored in NATO symposia on integrated multinational crisis response forces.

25.     These systems attempted to address challenges in tracking small, fast-moving objects like mortars or missiles, where traditional radar often failed due to limitations in resolution for low-signature targets, but with only limited success.

5

26.     These limitations, which served as the inspiration for Saltsman's invention, were made readily apparent during the early stages of the United States' 2003 invasion of Iraq. As U.S. soldiers settled into fortified forward operating bases across the country, they faced a new challenge to their security – "hit-and-run" mortar fire.

27.     Small insurgent teams would drive to a pre-surveyed spot, drop a lightweight tube, fire a short string of mortars, then pack up and flee before troops could respond.[3]

28.     Existing systems were woefully inadequate to combat those threats, taking too long to detect, locate, and react to incoming mortar fire.

29.     Although numerous object-tracking technologies originated in military applications, they are now relevant to many facets of human life. Today, these same technologies underpin advanced applications like drone technology, self-driving cars, automated manufacturing, and precision surveying in construction, among others. Layered with AI for predictive analytics, they deliver unprecedented real-time performance in military, civilian, and industrial domains.

## THE PATENT-IN-SUIT - U.S. PATENT NO. 7,433,021

30.     U.S. Patent No. 7,433,021, titled "Stereoscopic Targeting, Tracking and Navigation Device, System and Method," was filed on July 20, 2005, and claims priority to an application filed on August 10, 2004. The '021 patent is valid and enforceable. A true and correct copy of the '021 patent is attached hereto as Exhibit A.

---

[3] *See, e.g.*, https://www.washingtonpost.com/archive/politics/2003/10/25/mortar-attacks-multiply-in-iraq/c374e268-eb3a-4678-b736-8682788efedd/; https://www.theguardian.com/world/2003/oct/24/usa.iraq.

31.　　The '021 patent describes a system for targeting, tracking, and navigation that uses two sensors, each with a two-dimensional array of detection pixels. For each sensor, computerized data associates each pixel with a predetermined azimuth and elevation relative to that sensor. When a target or beacon is detected at a pixel, the system automatically determines the corresponding azimuth and elevation for that sensor. The disclosure also provides that more than one detection pixel at the same time is capable of detecting the target or beacon.



Ex. A, '021 patent Fig. 1.

32.　　The patent further explains that three-dimensional position may be computed using angle information from both sensors together with their known separation and relative orientation, and it describes calibration procedures for establishing and applying the pixel–angle association during operation. The patent also includes a single-sensor configuration in which a sensor with a two-dimensional pixel array and stored per-pixel angle associations automatically determines azimuth and elevation for that sensor when a target is detected by a pixel, and it identifies example applications such as tracking moving objects and assisting navigation around stationary obstacles.

**COUNT I**

**INFRINGEMENT OF U.S. PATENT NO. 7,433,021**

33.　　The preceding paragraphs are incorporated by reference as if fully set forth herein.

34.     The '021 patent is valid and enforceable.

35.     VAT is the owner and assignee of all rights, title, and interest in the '021 patent, including the rights to grant licenses, to exclude others, and to recover past damages for infringement of that patent.

36.     Upon information and belief, SICK makes, uses, offers to sell, sells, and/or imports in the United States the SICK Visionary-S 3D Vision Sensors (collectively, the "Accused Instrumentalities" or "the SICK Stereoscopic Camera Systems").

37.     Upon information and belief, the SICK Stereoscopic Camera Systems comprise a sensor system for tracking and navigation. *See, e.g.,*



https://www.sick.com/media/docs/5/95/795/product_information_visionary_s_en_im0083795.pdf

38.     Upon information and belief, SICK makes, uses, offers to sell, sells, and imports 3D vision products, including the Visionary-S family, that in normal operation capture synchronized stereo image data with two imagers, each comprising a two-dimensional array of pixels, and generate calibrated 3D outputs. SICK's materials describe Visionary-S as a stereo system in which "two synchronized imagers … capture the same scenery … at the same point in time." *See, e.g.,*



https://www.sick.com/media/docs/5/95/795/product_information_visionary_s_en_im0083795.pdf

---

**From Z-map to point cloud**

A stereo image camera contains two synchronized imagers that capture the same scenery using the same exposure settings at the same point in time. In the following text the two acquired images are called left and right image. The stereo imager uses the effect that the displacement between the same point in the left and the right image is a measure for the z-distance of the point to the imagers. This displacement is called the disparity of the point. To obtain this disparities in both images first the lens distortion is corrected. Then a common reference system is used and both images are converted to this reference.
In our stereo camera two references are used, depending on how the color information and the distance information are mapped to each other:
  • if the color is mapped onto the distance, the focal point and axis of the left imager is used as reference,

---

https://support.sick.com/sick-knowledgebase/article/?code=KA-07826

39.    SICK's Visionary-S materials explain that the device uses intrinsic camera parameters to "describe how the data is mapped from the imager chip into the camera coordinate system," including "a mapping from pixel indices … into a metric coordinate system," and describe use of calibration in producing calibrated 3D output. *See, e.g.*,

---

**Intrinsic parameters**

The intrinsic parameters describe how the data is mapped from the imager chip into the camera coordinate system. Those parameters describe the optical properties of the imaging system. They do not change as long as the optics are fixed, which is the case for our sensors. As those parameters include a mapping from pixel indices (pixel positions on the imager chip) into a metric coordinate system, we have to define the values either in metric units or in relation to the pixel indices.

---

https://support.sick.com/sick-knowledgebase/article/?code=KA-07826

40.    Upon information and belief, Visionary-S captures synchronized stereo images and, using stored calibration parameters, automatically produces calibrated 3D outputs on a frame-by-frame basis. When the same target is captured at the same time by both sensors, Visionary-S automatically determines, for each sensor, the viewing direction to that target (i.e., azimuth/elevation) based on the pixel(s) that registered it and the computerized data described above. *See, e.g.*, https://support.sick.com/sick-knowledgebase/article/?code=KA-07826.

41.     Upon information and belief, each exposure involves multiple pixels detecting the scene concurrently such that a target or beacon is detected by multiple pixels within the same frame. *See, e.g.*,

**Product description**

Thanks to the innovative 3D snapshot technology, Visionary-S 3D vision sensors from SICK offer maximum flexibility for countless applications in factory automation. Based on the stereo vision principle, with the Visionary-S, SICK is offering solutions for the highest demands on accuracy and speed, even for stationary applications. The Visionary-S combines structured illumination with the proven technology of a color camera and delivers colorful depth images in real time. Powerful visualization tools, broad support of common programming languages and reliable 2D and 3D information make the Visionary-S the ideal solution for robotics, intralogistics and various quality assurance tasks in production, to name a few examples.

**At a glance**

- Up to 30 color depth images per second
- Works in absolute darkness and in daylight of up to 40 klx
- Resolution: 640 px x 512 px; depth resolution down to the sub-millimeter
- Output of 3D color data via a Gigabit Ethernet interface
- Temperature range: 0 °C ... 50 °C (depending on the housing), enclosure rating: IP67
- HDR mode

**Your benefits**

- Rugged cameras with a working range of 0.50 m to 6.50 m for industrial use
- More than 320,000 depth and color intensity values in a single recording
- High recording speed with very high resolution at the same time
- Flexibility: The camera can be integrated with the help of common programming languages
- High-efficiency illumination: Reliable depth data even with ambient light
- Visionary-S CX offers direct output of color and depth values via Ethernet
- Visionary-S AP is based on SICK AppSpace, which allows customers to create their own applications and load them onto the camera or use application-specific Key Apps

https://www.sick.com/media/docs/5/95/795/product_information_visionary_s_en_im0083795.pdf

42.     Upon information and belief, SICK has directly infringed the '021 patent by, among other things, making, using, offering for sale, importing, and/or selling the SICK Stereoscopic Camera Systems through at least October 10, 2025 (the expiration date of the '021 patent, inclusive of patent term adjustment). Upon information and belief, SICK AG causes the accused Visionary-S products to be imported into the United States (including into this District), and SICK, Inc. and SICK Product & Competence Center Americas, LLC sell, offer to sell, and use those products in the United States, including in this District.

10

43.     Upon information and belief, by making, using, testing, offering for sale, importing, and/or selling the SICK Stereoscopic Camera Systems, SICK has injured VAT and is liable to VAT for directly infringing one or more claims of the '021 patent, including at least Claim 1, pursuant to 35 U.S.C. § 271(a). The SICK Stereoscopic Camera Systems practice each limitation of at least Claim 1.

44.     SICK has had knowledge of the '021 patent since at least July 22, 2025, when it received a letter identifying the '021 patent and notifying it of its infringement.

45.     Upon information and belief, through at least October 10, 2025, SICK has also indirectly infringed the '021 patent by active inducement under 35 U.S.C. § 271(b).

46.     Upon information and belief, at least SICK's customers, end users, and system integrators directly infringe the '021 patent in the United States by using the SICK Stereoscopic Camera Systems in their ordinary and customary manner. Since at least July 22, 2025, SICK has known of the '021 patent (e.g., via VAT's notice letter of that date) and knew or was willfully blind that such use would constitute infringement. SICK specifically intended to cause those infringing acts by making and supplying the accused systems configured for the infringing operation and by providing user manuals, product support, training, and other instructions that encourage and direct customers, integrators, and end users to operate the products in a way that meets the claim limitations, including at least Claim 1. By promoting and instructing ordinary and intended use that practices the claim elements, SICK has actively induced infringement of the '021 patent with knowledge that the induced acts constitute infringement, in violation of 35 U.S.C. § 271(b).

47.     Despite having notice of its infringement, upon information and belief, SICK continued—through at least October 10, 2025—to make, use, test, offer for sale, import and/or sell the SICK Stereoscopic Camera Systems in reckless disregard of VAT's patent rights. SICK's conduct is willful, and VAT is therefore entitled to enhanced damages under 35 U.S.C. § 284.

48.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '021 patent.

49.    As a result of SICK's infringement of the '021 patent, VAT has suffered monetary damages and seeks recovery in an amount adequate to compensate for SICK's infringement, but in no event less than a reasonable royalty for the use made of the invention by SICK together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff VAT respectfully requests that this Court enter:

1.  A judgment in favor of Plaintiff VAT that SICK has infringed the '021 patent, either literally or under the doctrine of equivalents;

2.  A judgment that SICK's infringement is willful;

3.  An award of damages resulting from SICK's acts of infringement within the period permitted by 35 U.S.C. § 286 and, in accordance with 35 U.S.C. § 284, enhanced up to three times for willful infringement;

4.  A judgment that this case is exceptional under 35 U.S.C. § 285 and awarding VAT its attorneys' fees, costs, and expenses incurred in prosecuting this action;

5.  A judgment and order requiring SICK to provide an accounting and to pay supplemental damages to VAT, including, without limitation, prejudgment and post-judgment interest; and

6.  Any and all other relief to which VAT may be entitled.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), VAT requests a trial by jury of all issues so triable by right.

Dated: November 2, 2025

*/s/ Bradford J. Black*
Bradford J. Black
Texas Bar No. 24086243
bblack@bradfordblack.com
**BRADFORD BLACK P.C.**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (415) 813-6211

12

Facsimile: (415) 813-6222

**Counsel for Plaintiff Vision Augmentation Technology LLC**